**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

KARLA FREEMAN,

              Petitioner,

    v.

SARAH DAVIS, et al.,

              Respondents.

Case No. 2:18-cv-8269 (BRM)

**OPINION**

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is the petition for a writ of habeas corpus of Petitioner Karla Freeman, ("Petitioner") brought pursuant to 28 U.S.C. § 2254, (ECF No. 1.) Following an order to answer, Respondents filed a response to the petition (ECF No. 6.) For the reasons set forth below, Petitioner's habeas petition is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.

## I.   BACKGROUND

In its opinion affirming the convictions and sentences of Petitioner, the Superior Court of New Jersey, Appellate Division, provided the following summary of the factual background of Petitioner's trial:

> This matter stems from an incident that occurred in the early morning hours of May 24, 2003 that resulted in the death of William Goldware. Earlier that evening, Goldware and his friends, Michael Murray and Warren "Cisco" Littlejohn, visited Black Jack's Lounge (Black Jack's) in Trenton. Murray last saw Goldware around 1:30 a.m. after Goldware dropped him off. While at Black Jack's, Murray had observed Goldware speaking to several women, including defendant.

At 2:44 a.m., the Trenton Police Department received a 911 call for which police responded to defendant's home address. Detective Ryan Burger and Officer Alex Cartegena arrived at the house and entered through the open door after they received no response to their knocking. Inside the house, the officers observed a flipped-over barstool and a blood stain on the wall. On the second floor, they found [Petitioner] sitting on a bed in the bedroom. The bedroom showed obvious signs of struggle, as there was an overturned ironing board and blood on the walls and dresser. [Petitioner] was crying and talking on the phone. She was wearing a blood-stained nightgown, and one of the fingernails on her left hand was missing. The fingernail was found in another bedroom.

Goldware was found lying in a puddle of blood on the bathroom floor. He was wearing boxer shorts, and he had twenty-four stab wounds, two of which were later described as fatal. The cause of his death was massive hemothorax and hemopericardium due to stab wounds to the lungs and heart.

Two cell phones were also found at the scene. One, a Motorola belonging to defendant, was found in the bedroom under an ironing board. The other, an LG Sprint phone which was registered to a Kandis Queen, was found near the bathroom. When the LG Sprint phone was opened, the screen read "Young Reese," a nickname for co-defendant Maurice Turner.

Officer George Muschal also reported to the scene. While investigating the kitchen, he observed an open utensils drawer. Muschal also spoke with defendant, who informed him that she had met Goldware at Black Jack's and invited him back to her house. She further told him that after Goldware arrived, she locked both locks on her front door, went upstairs, "put a record on, and . . . [they] proceeded to have sex." [Petitioner] told Muschal that during this time she heard a loud bang and that a man came into the bedroom, said "Give it up," and instigated a struggle. During this struggle, [Petitioner] said she was kicked about the face and back. [Petitioner] further related that Goldware tried unsuccessfully to flee by way of the bathroom window, but the window was blocked by bars. [Petitioner] told Muschal that when the attacker fled the house, she called 911 several times. During her recounting of the incident to Muschal, [Petitioner] was "nervous" but "talked calmly."

[Petitioner] also spoke to Detective Timothy Thomas. According to Thomas, [Petitioner] was crying, covered in blood, and was "visibly upset." [Petitioner] told Thomas that she had met Goldware at a bar,

that they returned to her home and "started to fool around," until someone "barged in, [and] started beating them both up." [Petitioner] then agreed to go to police headquarters with Thomas.

At headquarters, [Petitioner] executed a waiver of her *Miranda*[1] rights, and then described the evening's events to Thomas. She stated that while at Black Jack's, she saw Warren "Cisco" Littlejohn, whom she recognized. Cisco told her Goldware was interested in her, and she and Goldware exchanged phone numbers. Goldware later called her and asked if he could come over to her house. She said yes, and the two exchanged several additional phone calls before Goldware arrived. While upstairs with Goldware, [Petitioner] heard a "screech," and an intruder began beating both her and Goldware. The intruder made demands for property, saying "[w]here the fuck it at?". When [Petitioner] responded with confusion, the intruder said, "shut the fuck up, bitch." [Petitioner] and Goldware then went into the bathroom, but they could not escape because of the bars on the window. [Petitioner] told Thomas that the intruder was 6'1", slim, twenty-nine years old, and that he "sounded like a black male." [Petitioner] also stated that she believed the intruder had hit her and Goldware with the ironing board and stool.

[Petitioner] reported that after the attack, she first called her grandmother because "when you're in trouble, you think about talking to your mom." Thomas asked why she felt she was in trouble if she did nothing wrong; [Petitioner] responded "I feel like I did something wrong." Before her grandmother answered the phone, [Petitioner] hung up and called 911. After relating this story, [Petitioner] asked Thomas if he thought she had committed the crime. He stated, "I think you did it or someone who you know did it," at which point [Petitioner] started "crying hysterically."

[Petitioner] then told Thomas she killed Goldware and she agreed to give a formal statement to that effect. [Petitioner] stated that Littlejohn facilitated a sex-for-money arrangement between [Petitioner] and Goldware, and Goldware came to [Petitioner's] house. A fight ensued when Goldware demanded sex and refused to pay for it. [Petitioner] stated that during the fight, she grabbed a knife from her kitchen and when Goldware started to choke her, she used the knife to stab him.

Later, however, while Thomas was compiling defendant's statement [Petitioner] presented a different version of the evening's events. She

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

said "Detective, that's not what happened. Me and Maurice set him up to rob him, and Maurice stabbed him." When Thomas asked if she was sure, she replied "No, no, that's not what happened. . . . I killed him."

Detective Edgar Rios next interviewed [Petitioner] in order to clarify her answers. [Petitioner] stated that Goldware called her and asked her how much it would cost to have sex; she informed him it would be $250. Goldware propositioned [Petitioner] which [Petitioner] told Rios, made her feel "sleazy" because she felt that Goldware thought he could have sex with her for free. [Petitioner] admitted that she would not have had sex with Goldware for free but that she would have done it for $250; she needed money to pay her bills. [Petitioner] further stated that after she had stabbed Goldware, she called her cousin's boyfriend, co-defendant Maurice Turner. When Turner arrived, she gave him the knife, told him she stabbed someone, and then directed him to leave. When asked why she called Turner, [Petitioner] stated, "[b]ecause I know he has a car. And I needed someone to get rid of the knife so I could tell you the story about someone breaking in and beating us up."

Upon meeting with Thomas again, [Petitioner] told him her sister told her she better tell Thomas the truth about what happened. [Petitioner] executed another *Miranda* waiver form, and again relayed to Thomas that Littlejohn arranged a meeting between her and Goldware. When Goldware called her later that evening, she informed him that she was going home and that she would call him when she got there. After [Petitioner] left Black Jack's, she asked Turner for a ride home. She declined Turner's offer to go to an after-hours bar, stating that she "got some money coming to my house." After hearing this, Turner told [Petitioner] to leave her door open so that he could enter and rob Goldware. [Petitioner] stated:

> [Reese] was saying he was going to hit [Goldware] in his head and go in his pockets and leave. So me and [Reese] got to my house. I went upstairs, and I asked [Reese] how he was going to rob [Goldware]. [Reese] said just have the lights out and I'm going to wrap something around my mouth. [Reese] said he was going to knock him off of the bed and go into his pockets and take his money. But I didn't think that he had guns or knives. So I just figured it was going to be just like

4

> he said it was going to be, just knock him off
> the bed, take his money and run. [Reese] said
> after he got the money, it would be half and
> half. Reese left and told me to call him when
> the boy came.

[Petitioner] then told Thomas that after Goldware arrived, she left
the door open so that Turner could enter. [Petitioner] heard Turner
as he entered the house and climbed the stairs, so she distracted
Goldware by kissing him. When Turner arrived in the bedroom, he
pushed [Petitioner] and Goldware to the floor and began asking
"where it's at?". Turner then stabbed Goldware "three or four times."
[Petitioner] and Goldware escaped to the bathroom, but Turner
followed them. When Turner finally fled the scene, [Petitioner] first
dialed her grandmother's telephone number before calling 911.

When Thomas asked [Petitioner] why she had given the earlier,
contradictory versions of the events, she stated, "[b]ecause I was
terrified, and I knew I had part in robbing [Goldware], but I did not
know [Turner] was going to stab [Goldware]." She further stated
that she had confessed to stabbing Goldware herself in an earlier
statement because she felt that if she had not left her door open,
Goldware would have never been stabbed, and she was also worried
about her cousin, Kandis Queen, who had a child with Turner. When
asked why this statement was more reliable than her previous
statements, [Petitioner] said, "[b]ecause I'm willing to take my
punishment, but I'm not willing to pay for somebody else murdering.
Also, this is the truth about what happened."

*State v. Freeman*, No. A-1369-07T4 at 3-10 (N.J. Super. Ct. App. Div. September 10, 2010).

The Mercer County Grand Jury returned Indictment No. 04-02-0122, charging Petitioner
and co-defendant, Maurice Turner, with one count of first-degree murder, in violation of N.J.S.A
§ 2C:11-3(a)(1) (count one); one count of first-degree felony murder, in violation of N.J.S.A. §
2C:11-3a(3) (count two); two counts of first-degree robbery, in violation N.J.S.A. § 2C:15-1 (count
three and four); one count of third-degree possession of a weapons for an unlawful purpose, in
violation of N.J.S.A. § 2C:39-4(d) (count five); and one count of fourth-degree unlawful
possession of a weapon, in violation of N.J.S.A. § 2C:39-5(d) (count six). (*See* ECF No. 7.)

Petitioner was charged alone with fourth-degree tampering with physical evidence, in violation of N.J.S.A. § 2C:28-6(1) (count seven). (*Id.*)

On March 1, 2006, the Honorable Charles A. Delehey began the joint jury trial of Petitioner and co-defendant Turner, but a mistrial was declared before the jury deliberated. (*See* ECF No. 9-2.) Petitioner's case was severed from co-defendant Turner's and the State dismissed counts III (first-degree robbery), V (possession of a weapons for unlawful purpose), VI (unlawful possession of a weapon), and VII (tampering with physical evidence). (*See* ECF No. 9-3.) Petitioner's second jury trial began on October 17, 2006. (*Id.*) On November 2, 2006, the jury found Petitioner not guilty of first-degree robbery and purposeful or knowing murder, but found Petitioner guilty of second-degree robbery, a lesser-included offense of count IV, and felony murder, count II. (ECF No. 9-12.) On January 5, 2007, Judge Delehey merged Petitioner's second-degree robbery count into the felony murder count and sentenced Petitioner to a term of thirty years imprisonment subject to a parole disqualifier for the full term. (*See* ECF No. 10-1.)

On November 7, 2007, Petitioner filed a Notice of Appeal with the Appellate Division. (ECF No. 10-2.) On September 10, 2010, the Appellate Division affirmed Petitioner's convictions. (ECF No. 10-3, *Freeman*, No. A-1369-07T4.) On February 10, 2011, the New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 10-4, *State v. Freeman*, 13 A.3d 363 (Table) (2011).)

On March 2, 2011, Petitioner filed a *pro se* post-conviction relief ("PCR") petition. (ECF Nos. 21-23.) Following an evidentiary hearing, the state court denied Petitioner's PCR petition on January 5, 2015. (ECF No. 10-11.) On March 19, 2015, Petitioner filed a Notice of Appeal before the Superior Court, Appellate Division, along with a motion to file Notice of Appeal as within time. (ECF Nos. 10-12 & 10-13.) On April 7, 2015, the Appellate Division granted Petitioner's

motion to file Notice of Appeal as within time. (ECF No. 10-14.) On September 7, 2017, the Appellate Division affirmed the denial of Petitioner's PCR petition but remanded for the limited purpose of correcting the judgment of conviction to reflect a final charge of second-degree robbery rather than first-degree robbery. (ECF No. 10-18, *State v. Freeman*, A-3386-14T2 (N.J. Super. Ct. App. Div. September 7, 2017.)) On February 28, 2018, the New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 10-19, *State v. Freeman*, 179 A.3d 1055 (Table) (2018).)

Petitioner filed her instant habeas petition with this Court, which was signed on April 13, 2018. (ECF No. 1.) Petitioner asserts the following ground for relief:

1. The trial court failed to provide an adequate jury instruction regarding the issue of causation and "divergent factual versions" of the respective parties as relating to causation;

2. The trial court erred in denying the defense's motion for a mistrial on the basis the jury may have been tainted as a result of observing Petitioner while she was in custody;

3. The prosecutor's summation exceeded the bounds of propriety and violated Petitioner's right to a fair trial by inferentially commenting on Petitioner's Fifth Amendment privilege when the prosecutor used the phrase "undisputed facts" in describing the prosecutor's version of the crime;

4. The trial court erred in denying Petitioner's motion for a new trial on the basis that once the jury had found Petitioner not guilty of knowing/purposeful murder and first-degree robbery, the jury's verdict finding Petitioner guilty of felony murder was fatally flawed;

5. Ineffective assistance of trial counsel for failing to advise Petitioner to accept the prosecution's pretrial plea offer of a fifteen-year sentence for aggravated manslaughter and for failure to locate, interview and call a witness at trial would could have testified Petitioner had consumed numerous alcoholic drinks on the day of the crime;

6. Ineffective assistance of trial counsel for (i) failing to argue for dismissal of the indictment on double jeopardy grounds after Petitioner's first trial ended in a mistrial; (ii) failing to fully and properly convey the State's

plea offer so that Petitioner could make a knowing and informed decision; (iii) failing to fully investigate Petitioner's case and proffer witnesses on Petitioner's behalf; and (iv) providing an ineffective presentation that deprived Petitioner of her right to testify at trial on her own behalf;

7. The prosecutor's refusal to offer a plea bargain to Petitioner prior to the first trial was retaliatory, punitive and deprived Petitioner of equal protection under the law;

8. Ineffective assistance of direct appeal counsel for failing to raise the claim that the jury should have been instructed on conspiracy and the claim that the Prosecutor should have been removed from the case; and

9. The cumulative effect of the combined errors raised in the post-conviction relief rendered the trial unfair and violative of Petitioner's constitutional right to due proceed and a fair trial.

(*See* ECF No. 1 ("Habeas Pet.").) Respondents filed an answer asserting Petitioner's claims are meritless. (ECF No. 6.)[2]

## II.   LEGAL STANDARD

Under the current version of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA), 28 U.S.C. § 2254 provides, the district court "shall entertain an application for writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012).

---

[2] After Respondents filed their answer, Petitioner filed a Notice of Appeal with the United States Court of Appeals for the Third Circuit on June 4, 2020. (ECF No. 15.) On December 15, 2020, the Court of Appeal dismissed the appeal "for lack of appellate jurisdiction because there has been no final order entered in this case from which [Petitioner] can appeal." (ECF No. 18.)

District courts are required to give great deference to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (*quoting Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 125 S. Ct. at 1376. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a

factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App' x 694, 697 (3d Cir. 2012) (*citing Rice v. Collins*, 546 U.S. 333, 339 (2006)).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *See Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365–66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

## III.   DECISION

### A.  Ground One: Inadequate Jury Instruction Violated Petitioner's Constitutional Rights

In ground one, Petitioner argues the trial court erred by failing to adequately instruct the jury regarding the issue of causation. Habeas Pet. at 6. Specifically, Petitioner contends the trial judge failed to instruct the jury that one of the requisite elements of a felony murder conviction is that the victim's death would not have occurred without the commission of the predicate felony, and the victim's death was a probable consequence of the predicate felony. *Id.* Additionally, Petitioner argues the trial court failed to instruct the jury on the divergent factual versions of the respective parties as relating to causation, violating Petitioner's constitutional right to a fair trial. *Id.*

The trial court charged the jury on felony murder as follows:

> Felony murder is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or attempt to commit, or the flight after committing or attempting to commit robbery. And in the course of such crime, or immediate flight therefrom any person causes the death of the robbery victim.
>
> Thus, it does not matter that the act which caused death was committed by a participant in the robbery other than the defendant. Nor does it generally matter that the act was that the act which caused death was committed recklessly or unintentionally or accidentally. Each participant in the crime of robbery, whether the participant herself caused the death or not, would be guilty of felony murder.
>
> . . . .
>
> You cannot find the defendant guilty of felony murder unless you first find her guilty beyond a reasonable doubt of having committed the crime of robbery in the first or second degree.
>
> . . . .

In order to meet its burden of proof, the [S]tate must prove beyond a reasonable doubt the following:

One, that but for the defendant's conduct in the commission of, or attempt to commit, or flight after committing or attempting to commit robbery, the victim would not have died. In other words, that the victim's death would not have occurred without the commission of the robbery.

Two, that the victim's death was a probable consequence of the commission of, or attempt to commit, or flight after committing or attempting to commit robbery.

In order for the death to be a probable consequence of robbery, the death must not have been too remote or too accidental in its occurrence, or too dependent upon another's volitional act to have a just bearing on the defendant's liability or the gravity of her offense.

In other words, you must decide if the [S]tate has proven beyond a reasonable doubt that under all the circumstances, the death did not occur in such an unexpected or unusual manner that it would be unjust to find the defendant responsible for the death of William Goldware.

(ECF No. 9-11, N.T. 11/2/06 at 31:12 to 33:19)

Petitioner presented this claim on direct appeal and contended the felony murder charge was insufficient because it violated *State v. Martin*, 119 N.J. 2 (1990). *See Freeman*, No. A-1369-07T4 at 19. The Appellate Division rejected this claim, finding the trial court gave a proper jury charge on felony murder, which required the jury to find causation before it found felony murder. *Freeman*, No. A-1369-07T4 at 23. The Appellate Division examined the decision in *Martin* and explained:

The [*Martin*] Court further found that the jury charge was inadequate because the defendant was entitled to a jury charge that was consistent with his version of the facts and which would have supplied the jury with the legal predicate to find that the victim's death was too remotely related to his conduct. [*Martin*, 119 N.J at 16.] The Court stated:

> When, as here, divergent factual versions give rise to different theories of causation, the trial court should provide the jury with appropriate instructions, depending on which version it chooses to accept. Because defendant's version was predicated on a divergence between the actual and designed or contemplated results, the court should have included an instruction that was consistent with the defendant's version. Without that charge, the jury could not properly consider the significance of defendant's version of the facts. So essential to the jury's deliberations was the charge that the failure to provide it clearly possessed the capacity to bring about an unjust result.

[*Id.* at 16-17 (internal citations omitted).

The Court also discussed the issue of instructing the jury as to causation on a felony murder charge. It stated, "[t]he court should instruct the jury that the defendant, whether a sole perpetrator or an accomplice, is liable for felony murder only if the death is not too remote, accidental in its occurrence, or too dependent on another's volitional act to have a just bearing on the defendant's culpability." *Id.* at 32. The Court set forth a more adequate felony murder jury charge, stating that such a charge

> would have instructed the jury that it must find not only that defendant committed the crime . . . and that the death of the victim occurred in the course of that crime, but also that her death would not have occurred but for the [defendant's actions] and that her death was not too remote or accidental in its occurrence. [*Id.* at 33.]

*Freeman*, No. A-1369-07T4 at 21-22. The Appellate Division found that there were no divergent factual versions in Petitioner's case. *Id.* at 22-23. Petitioner had argued she did not intend for her co-defendant to use a weapon during the robbery, instead she agreed only to the theft. *Id.* at 23. The Appellate Division found "this is not a factual dispute, but is instead a state-of-mind argument that was resolved in the jury's decision to find defendant not guilty of first-degree robbery and to convict her of second-degree robbery." *Id.* Further, it was noted by the Appellate Division the

charge in Petitioner's case mirrored the language set forth in *Martin* for a proper jury charge on felony murder, charging:

> that the victim's death was a probable consequence of the commission of, or attempt to commit, or flight after committing or attempting to commit robbery.
>
> In order for the death to be a probable consequence of robbery, <u>the death must not have been too remote or too accidental in its occurrence, or too dependent upon another's volitional act to have a just bearing on the defendant's liability or the gravity of her offense.</u>
>
> [(emphasis added).]

*Id.*

The paramount question on habeas review of a jury instruction is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," *Estelle v. McGuire*, 502 U.S. 62, 73 (1991), and "not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Jacobs v. Horn*, 395 F.3d 92, 111 (3d Cir. 2005) (citations omitted). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68. "Questions related to jury charges are normally matters of state law and are not cognizable in federal habeas review." *Paulino v. Ortiz*, No. 03-4463, 2005 WL 2922369, at *4 (D.N.J. Nov. 4, 2005). A habeas claim will lie only where "the jury instruction is so prejudicial as to amount to a violation of due process and fundamental fairness." *Id.* at *4 (quotations omitted). The Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (1997); *see In re Winship*, 397 U.S. 358, 364 (1970) (holding due process requires proof beyond reasonable doubt of each fact necessary to constitute crime with which defendant is charged); *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (finding jury instruction suggesting that jury may convict without proving

each element of crime beyond reasonable doubt violates constitutional rights). To show that a jury instruction so infected the trial:

> [A] habeas petitioner must demonstrate both (1) that the instruction contained some ambiguity, inconsistency, or deficiency, and (2) that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.

*Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (emphasis added) (quoting *Waddington v. Sarausad*, 555 U.S. 179, 189 (2009)) (internal quotation marks omitted). "An omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Having reviewed the record, the Court finds Petitioner's claim regarding errors in the felony murder charge relating to causation does not fall within the narrow circumstances that warrant habeas relief base on erroneous jury instructions. Here, the Appellate Division found the causation instruction for felony murder complied with state law and required the jury to find causation before it found felony murder. *Freeman*, No. A-1369-07T4 at 23. The jury instruction on felony murder did not relieve the State of its burden of proving every element of the crime beyond a reasonable doubt. Rather, the instruction required the jury to find the necessary causation. *See Williams*, 637 F.3d at 223; *see also Sandstrom*, 442 U.S. at 523 (1979). Petitioner is arguing here that the jury instruction on causation should have been tailored to Petitioner's version of facts of the case, as Petitioner argued the Appellate Division was required by State law precedent,. However, that is a State law claim and not a basis for habeas relief under the Due Process Clause. As such, Petitioner has not shown the state court's ruling was an unreasonable application of federal law and the claim is denied.

**B.  Ground Two: Trial Court Erred in Denying Motion for Mistrial**

In ground two, Petitioner argues the trial court erred in denying defense counsel's motion for a mistrial on the basis the jury may have been tainted as a result of observing the Petitioner while she was in custody. Habeas Pet. at 8. This claim arises out of the following facts explained by the Appellate Division on direct appeal:

> During the course of the trial, Juror Number Twelve (Juror Twelve) saw [Petitioner] in the custody of sheriff's officers during a lunch break. When the court questioned Juror Twelve, he stated that he told the other jurors that he had seen [Petitioner] during the lunch break but that he had not said anything else and had not indicated [Petitioner] was in custody. Asked whether he previously knew [Petitioner] was in custody, Juror Twelve responded
>
>> I believe it was discussed this morning as a matter of fact. People were wondering if the [Petitioner] was incarcerated or not incarcerated, during this time and preceding up into this. We were discussing that, but we didn't know. That was the extent of it.
>
> The court inquired further of Juror Twelve as to whether he had seen [Petitioner] in handcuffs or shackles. He had seen this, but he stated he had not communicated that information to his fellow jurors.
>
> The judge next questioned Juror Number Six (Juror Six), who was with Juror Twelve, when he saw [Petitioner] in custody. Because of his placement on the elevator, Juror Six had not seen [Petitioner]. He further stated that Juror Twelve had not told him what he saw. Notably, Juror Six, also denied that there had been conversations in the jury room about whether [Petitioner] was in custody.
>
> [Petitioner] moved for a mistrial or, alternatively, for the dismissal of Juror Twelve. The court denied the motion for a mistrial, but excused Juror Twelve. The judge questioned each juror individually about what, if anything, they had heard that might make it difficult for them to be fair and impartial. After asking each juror whether he or she had heard any discussions about [Petitioner's] custody status or any discussion concerning what Juror Twelve saw during the lunch hour, the court found that no jurors had heard any such discussions.

Claiming inconsistencies between Juror Twelve's statements and those of the rest of the jury, [Petitioner] urged the court to declare a mistrial. The court denied this request, ruling as follows:

> All right, the [c]ourt is faced, obviously, with the inconsistent statement of [Juror Twelve], that there was a discussion in the jury room concerning bail or custody of the [Petitioner]. The [c]ourt has interviewed twelve remaining jurors. The jurors have been interviewed individually. To a person, they have said there were no discussions about bail or custody, and they have said that [Juror Twelve] didn't tell them anything that he observed during the luncheon hour.
>
> Now, the argument is that with that inconsistency, the [c]ourt must grant a mistrial. The [c]ourt doesn't see it that way. One, it's quite possible [Juror Twelve's] talking and no one is listening. That could have happened. The second possibility is that while [Juror Twelve] may have been curious about bail, and thought that others were talking about it, maybe they weren't.
>
> And why does the [c]ourt say that? The [c]ourt is asked to believe that twelve people interviewed individually, without the opportunity for collusion, all told a consistent story, and that [Juror Twelve] is therefore, the one in the minority. The [c]ourt isn't certain what happened. What it does know is this: [i]t knows that it has removed [Juror Twelve] from the case who saw the [Petitioner] in shackles. Whether the jury discussed bail or custody, the [c]ourt does not view as a reason for mistrial. I think every juror in this courthouse has to wonder whether a [Petitioner]is in bail or in custody. And quite frankly, with a murder charge, even a non-lawyer would probably believe that the likelihood is . . . custody as opposed to bail.
>
> The [c]ourt is aware that defendants are not to be exhibited with indicia of guilt, that is, prison garb, shackles or handcuffs. With the removal of [Juror Twelve], that has been accomplished. None of the other jurors heard [Juror Twelve] say anything about what he observed at the luncheon hour, and [Juror

17

> Twelve] himself says that he did not discuss the
> handcuffing or shackling of [Petitioner] with any of
> the jurors. As the [c]ourt sees it, while the
> proceedings of this trial insofar as the movement of
> [Petitioner] and the avoidance of having jury contact
> have not been ideal, they are not detrimental so as to
> require a new trial.

> The court then instructed the jury that [Petitioner's] ability or
> inability to post bail was of no consequence to the case.

*Freeman*, No. A-1369-07T4 at 11-14. On direct appeal, the Appellate Division affirmed the trial

court's decision to deny a mistrial. *Id.* at 24 (finding "the judge was justified in his belief that the

remaining jurors had no knowledge of [Petitioner] being shackled and in custody, and that the

dismissal of Juror Twelve and curative instruction was adequate to address any potential prejudice

to [Petitioner.]")

A criminal defendant has a constitutional right to appear before a jury free of visible

restraints. *Deck v. Missouri*, 544 U.S. 622, 626–29 (2005). Visible shackling of a criminal

defendant during trial "undermines the presumption of innocence and the related fairness of the

factfinding process" and "affront[s] the dignity and decorum of judicial proceedings that the judge

is seeking to uphold." *Deck*, 544 U.S. at 630–31 (quoting *Illinois v. Allen*, 397 U.S. 337, 344

(1970)). As such, the use of visible restraints is prohibited "absent a trial court determination, in

the exercise of its discretion, that they are justified by a state interest specific to a particular trial."

*Deck*, 544 U.S. at 629.

With respect to allegedly unconstitutional restraints at trial, a habeas petitioner is only

entitled to relief where the error had "substantial and injurious effect or influence in determining

the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The Third Circuit has "long

held that a brief, unintended glimpse of a defendant in handcuffs is not inherently prejudicial and

does not require a mistrial without an affirmative showing of actual prejudice." *United States v.*

*Roane*, 338 F. App'x 127, 130 (3d Cir. 2009) (citing *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974) ("The fact that a jury may briefly see a defendant in handcuffs is not so inherently prejudicial as to require a mistrial").)

The trial court questioned every juror and made a finding Juror Twelve did not inform the other jurors that Petitioner was observed in restraints. *Freeman*, No. A-1369-07T4 at 14. The trial court also found the remaining jurors all were consistent in stating the jury did not discuss if Petitioner was in custody, and even if they had it is not uncommon for a jury to consider if a defendant in a murder case is in custody. *Id.* at 13-14. The Appellate Division determined there was no evidence in the record to show the trial judge abused his discretion in believing the remaining jurors. *Id.* at 26. Petitioner has failed to provide evidence or argument to contradict the state courts' factual determinations by clear and convincing evidence. *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (citing 28 U.S.C § 2254(e)(1).)

The trial court excused Juror Twelve and gave a curative jury instruction, remedying any prejudice that may have occurred from the juror seeing Petitioner in restraints. Here, even if Juror Twelve informed the other jurors Petitioner was observed in restraints, that information is not so prejudicial to necessitate a mistrial, especially when considering Petitioner's admission to planning the robbery with her co-defendant. *United States v. Fredericks*, 684 F. App'x 149, 164-65 (3d Cir. 2017) ("At issue in this case is whether a brief, inadvertent observation of a defendant in handcuffs offends a defendant's constitutional rights ... 'Because a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant, [defendant] must demonstrate actual prejudice to establish a constitutional violation. [Defendant] did not examine the jury and has adduced no other evidence probative of prejudice. He has failed to establish actual prejudice'") (internal citations omitted). Petitioner has failed to show the actual

prejudice necessary to establish a constitutional violation. Petitioner has not shown the Appellate Division findings were contrary to or an unreasonable application of clearly established federal law. For the foregoing reasons, ground two is denied.

### C.  Ground Three: Prosecutor's Infringement on Petitioner's Fifth Amendment Right

Petitioner's third ground for relief asserts the prosecutor's comments during summation exceeded the bounds of propriety and violated Petitioner's right to a fair trial by inferentially commenting on Petitioner's Fifth Amendment privilege when the prosecutor used the phrase "undisputed facts" in describing the prosecutor's version of the crime. Habeas Pet. at 9. Petitioner argues there was a strong inference Petitioner had failed to testify and refute the facts as alleged by the prosecution. *Id.*

The Appellate Division summarized the facts that lead to the instant claim as follows:

> Later, after both the State and [Petitioner] had rested, the prosecutor said during closing arguments:
>
> These are the undisputed facts:
>
> William Goldware was brutally and savagely murdered, no doubt about that. The murder occurred in the home of [Petitioner]. She wasn't a visitor, she wasn't just staying there, that's where she lived. She had met him earlier that night in Black Jack's. And at some point he had gone to her house. These are facts which are not in dispute, ladies and gentlemen.
>
> He was stabbed numerous times; you heard the medical examiner say 24 times. That is not counting the physical blows he received on top of the head[.]
>
> At this point, [Petitioner] objected to the State's use of the phrase "undisputed facts," arguing that such wording implied that [Petitioner] had a burden to dispute the facts or that [Petitioner] had admitted these facts. In response to such arguments, the court issued a curative instruction to the jury, stating:
>
> > any comment by either counsel concerning the evidence is not binding on you. So if counsel

> suggests that something is unrefuted and you believe
> it is, you're going to follow your own recollection.
> Again, you are the judges of the facts, and the [c]ourt
> reminds you, defendant has no burden of proof here
> at all.

*Freeman*, No. A-1369-07T4 at 14-15.

The Fifth Amendment privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's failure to testify at trial. *See Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). A prosecutor also cannot suggest that a jury can treat defendant's silence as evidence of his guilt. *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). A prosecutor is permitted, however, to make reference to a defendant's silence when it is "a fair response to a claim made by defendant or his counsel." *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). To determine whether the prosecutor's remarks violated Petitioner's Fifth Amendment privilege, the reviewing court must determine whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). However, this inquiry must not be conducted in isolation; rather, the reviewing court should examine the prosecutor's comments within the broader context of the entire trial. *See id.*

The Appellate Division considered Petitioner's claim and found it meritless. *See Freeman*, No. A-1369-07T4 at 26-29. The Appellate Court explained it must consider if the prosecutor's remarks were "so egregious that it deprive[d] [Petitioner] of a fair trial." *Id.* at 28, citing *State v. Frost*, 158 N.J. 76, 83 (1999). The Appellate Division found the trial judge's immediate and forceful curative instruction preserved Petitioner's right to a fair trial and it is presumed the jury followed the trial judge's instruction. *Id.* at 29, citing *State v. Burns*, 192 N.J. 312, 335 (2007).

21

Having reviewed the record for Petitioner's trial, this Court agrees with the Appellate Divisions determination. The prosecutor's comments did not directly refer to Petitioner's silence or her decision not to testify. Even if the Court assumes for the sake of argument that the jury construed the prosecution's use of the term "undisputed facts" to bring Petitioner's silence to the jury's attention, the trial judge responded to the defense objection with an immediate curative instruction. The trial judge instructed the jury "if counsel suggests that something is unrefuted and you believe it is, you're going to follow your own recollection. Again, you are the judges of the facts, and the [c]ourt reminds you, defendant has no burden of proof here at all." (ECF No. 9-10, N.T. 11/1/06 at 156:2-6.) A jury is presumed to follow the court's instructions. S*ee Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). This presumption can only be overcome by a showing of an "overwhelming probability" that the jury was unable to follow the court's instructions. *See Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Here, nothing about the prosecutor's remarks would have overborne a jury's inclination or ability to follow the judge's instructions; nor does Petitioner argue they did.

Accordingly, Petitioner's arguments regarding the unconstitutional effect of the prosecutor's remarks are without merit, and the Appellate Division's decision was not contrary to or an unreasonable application of United States Supreme Court precedent. Accordingly, Petitioner is not entitled to relief from his conviction on this ground.

### D.  Ground Four: Inconsistent Verdicts Violated Petitioner's Right to Due Process

In ground four, Petitioner argues the trial court erred in denying Petitioner's motion for a new trial on the basis that once the jury found Petitioner not guilty of knowing/purposeful murder and first degree robbery, the jury's verdict finding Petitioner guilty of felony murder was flawed. Habeas Pet. at 11. Petitioner submits because the jury acquitted Petitioner of knowing/purposeful

murder and first-degree robbery, the jury's felony murder guilty verdict was fatally flawed, inconsistent, and violated Petitioner's due process constitutional rights. *Id.* Petitioner claims the inconsistency was magnified by the fact the prosecutor had voluntarily dismissed a second-degree robbery charge and the jury found Petitioner guilty of the lesser included offense of second-degree robbery at trial. *Id.*

The Appellate Division disagreed and denied Petitioner's claim. *Freeman*, No. A-1369-07T4 at 30-31. The Appellate Division explained the verdicts were not defective because second-degree robbery is a predicate under the felony murder statute and the jury was properly instructed in that regard. *Id.* at 30. The Appellate Division noted consistency in verdicts is not necessary as long as there is sufficient evidence to uphold a verdict. *Id.* at 30, citing *United States v. Powell*, 469 U.S. 57,65 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932). Reasoning the New Jersey felony murder statute, N.J.S.A. 2C:11-3(a)(3), lists robbery which under N.J.S.A. § 2C:15-1, includes both first-degree and second-degree robbery, as a predicate offense for a conviction of felony murder, the Appellate Division ruled Petitioner's felony murder conviction was not precluded, as a matter of law, by her acquittal of purposeful or knowing murder or first-degree murder. *Id.* at 31.

Generally, "inconsistent verdicts are constitutionally tolerable." *Dowling v. United States*, 493 U.S. 342, 353-54, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (citation omitted). Challenges to purported inconsistent verdicts are analyzed under the standard articulated by the Supreme Court in *Dunn*. There, the Court declined to disturb a conviction stemming from a jury verdict just because it was inconsistent with its acquittal on another count. *Dunn*, 284 U.S. at 393-94. The Supreme Court upheld this reasoning in *Powell*, when it reiterated *Powell's* conviction on some counts could not be attacked just because it was inconsistent with her acquittal on other counts.

23

469 U.S. 57. *Powell*, who was charged with drug conspiracy as well as overt acts such as drug possession and facilitating the conspiracy through telephonic communication, was acquitted of the actual conspiracy and drug possession counts but convicted of facilitating the underlying felonies through the telephone conversations. *Id.* at 59-60. The Supreme Court rejected her argument that acquittal on the conspiracy and drug possession counts demanded the Court vacate the facilitation charges.

> This problem is not altered when the trial judge instructs the jury that it must find the defendant guilty of the predicate offense to convict on the compound offense. Although such an instruction might indicate that the counts are no longer independent, if inconsistent verdicts are nevertheless reached those verdicts still are likely to be the result of mistake, or lenity, and therefore are subject to the *Dunn* rationale. Given this impasse, the factors detailed above—the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity—suggest that the best course to take is simply to insulate jury verdicts from review on this ground.

*Id.* at 68-69.

Petitioner argues because she was found not guilty of purposeful or knowing murder or first-degree robbery, the conviction of felony murder was flawed. This argument fails because Petitioner was convicted of second-degree robbery pursuant to N.J.S.A. § 2C:15-1, which is a predicate offense for a conviction of felony murder in New Jersey. N.J.S.A § N.J.S.A. 2C:11-3(a)(3). Therefore, Petitioner has not shown her verdicts were inconsistent and a violation of her constitutional rights. Petitioner is denied relief as to this claim.

### E.  Grounds Five and Six: Ineffective Assistance of Counsel

In grounds five and six, Petitioner alleges various claims of ineffective assistance of trial counsel.[3] Petitioner alleges the following specific errors:

1.  Trial counsel failed to advise Petitioner to accept the prosecution's pretrial plea offer of a fifteen-year sentence for aggravated manslaughter;

2.  Trial counsel was ineffective for failing to locate, interview and call witnesses at trial who could have testified Petitioner had consumed numerous alcoholic drinks on the day of the crime;

3.  Trial counsel failed to argue for dismissal of the indictment on double jeopardy grounds after Petitioner's first trial ended in a mistrial;

4.  Trial counsel provided an ineffective presentation that deprived Petitioner of her right to testify at trial on her own behalf.

*See* Habeas Pet. at 12-14.

The standard governing claims of ineffective assistance of counsel is well established, as set forth by the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). To support an ineffective assistance of counsel claim under *Strickland*, a petitioner must first show "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.' " *Jacobs*, 395 F.3d at 102. A petitioner asserting ineffective assistance must show counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of

---

[3] Petitioner's ground five allegations are raised again in ground six. The Court will address these two grounds together.

25

counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A petitioner also must affirmatively demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial ... whose result is reliable." *Strickland*, 466 U.S. at 687, 692–93; *Shedrick*, 493 F.3d at 299. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299.

"Because failure to satisfy either [*Strickland*] prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 697–98).

When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington*, 562 U.S. at 101). For § 2254(d)(1) purposes, "an unreasonable application of federal law is different from an incorrect application of federal law." *Grant*, 709 F.3d at 232. "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of

ineffective assistance of counsel claims is therefore "doubly deferential." *Id.* (quoting *Cullen*, 563 U.S. at 189). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Grant*, 709 F.3d at 232.

### 1.  Failure to Advise

Petitioner's first ineffective assistance of counsel claim alleges trial counsel failed to advise Petitioner to accept the prosecution's pretrial plea offer of a fifteen-year sentence for aggravated manslaughter. *See* Habeas Pet. at 12.

Petitioner raised this claim on collateral appeal and the PCR court held an evidentiary hearing on July 25, 2014, in which Petitioner and trial counsel, Robin Lord, Esq., testified. (*See* ECF No. 10-9, PCR hearing 7/25/14.) The PCR court noted Petitioner could not remember exactly when the offer was made, but thought it was after her first trial. (ECF No. 10-11 at 8, PCR Ct. Op.) The PCR court explained Petitioner also testified that "at the time the plea was offered, she was unwilling to plea to any charge involving the killing of the victim, as she was not the party who killed him." (*Id.*) However, Petitioner "testified that had she understood the definition of felony murder, she would have accepted the plea offer for manslaughter." (*Id.*) The PCR court also noted during cross-examination, Petitioner testified she "did not believe she would be convicted of murdering the victim," and "she initially would not have been comfortable having to testify against her co-defendant, for fear of retaliation." (*Id.*) However, Petitioner did state, "if she had understood felony murder more clearly, she would have testified against him." (*Id.*)

The PCR court summarized trial counsel's testimony as follows:

> Petitioner's trial counsel, Robin Lord, Esq. testified that she does not remember a plea offer ever being offered on the case, and specifically remembered the Judge stating that this was the only case he'd ever presided over where no plea offer was made. Lord further stated that her file does not indicate any evidence of a plea ever being offered. She explained that if the plea offer was in writing, she would have a

> copy in the file, and would have provided a copy to her client, and if
> the plea offer was oral, she would have placed it on the record. She
> testified that while she does not recall any plea ever being offered in
> this case, it is her obligation to relate any plea offer to her client, and
> she would have done so had it been offered. Additionally, she
> explained that it is her practice to explain the pros and cons of any
> plea offer to her client, but makes it clear that the decision of whether
> or not to accept the plea is their decision.

(*Id.* at 8-9.) The PCR court found Petitioner failed to establish counsel's performance was

deficient. (*Id.* at 9.)  The PCR court explained that trial counsel testified if there was a plea offer,

she would have explained the plea to Petitioner. (*Id.*) The PCR dismissed the claim and explained:

> Petitioner's testimony suggests that she willingly rejected the alleged
> plea offer to manslaughter. She stated that she believed that she
> would not be convicted of the victim's murder. Additionally, she
> stated that at that point, she would not have testified against her co-
> defendant, a condition of the alleged plea offer. The Petitioner's
> claim fails to establish that her counsel's performance was deficient,
> as she offers no evidence that Ms. Lord failed to sufficiently explain
> her charges. Her bald assertion that she did not understand the
> charges is not enough to meet the stringent standard delineated in
> *Strickland*.

(*Id.*)

On appeal from the PCR court's denial, the Appellate Division found no there was no

reason to disturb the PCR court's finding Petitioner failed to demonstrate trial counsel's advice

was deficient. *Freeman*, A-3386-14T2 at 15-16. The Appellate Division further found Petitioner's

claim she did not understand the charges was insufficient to meet the standard for establishing

ineffective assistance. *Id.* The Appellate Division concluded there was no evidence Petitioner's

counsel failed to adequately convey the plea offer to Petitioner. *Id.* at 16.

To establish an ineffective assistance of counsel claim where a defendant rejected a plea

offer, the defendant must show counsel's advice during the plea process was not "within the range

of competence demanded of attorneys in criminal cases." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)

(quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). Petitioner must also show:

> but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 132 S.Ct. 1376, 1385 (2012).

Here, Petitioner is unable to establish counsel was ineffective. Petitioner asserts trial counsel was ineffective for failing to advise Petitioner to take the alleged plea offer. However, trial counsel testified while she did not recall a plea offer, she did recall "begging [the State] for 15 years from the inception of time because that was the presumptive number for a first degree robbery," and if a plea offer was made, it was her "duty, obligation and responsibility to relay every plea offer to [her] client." (ECF No. 10-9, N.T. 7/25/14 at 16:6-8, 11-13.) Trial counsel also testified she does not "recommend plea offers to my clients. My practice is as follows. What I do is I tell them the pros and cons of taking a plea offer versus going to trial." (*Id.* at 32:9-12.) As explained by the PCR court, Petitioner conceded she did not want to plead guilty because she believed she would not be convicted of murder. Additionally, Petitioner did not want to testify against her co-defendant. (ECF No. 10-11 at 8.) Petitioner made an unsupported assertion on collateral appeal that she did not understand felony murder, which fails to prove counsel's advice during the plea process was not "'within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56. Based on the aforementioned testimony, Petitioner has failed to establish trial counsel misadvised her regarding a plea offer, or that but for the ineffective advice of counsel there is a reasonable probability Petitioner would have accepted a plea offer. The state

court's adjudication of this claim was not an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on this claim.

## 2. Failure to Investigate

Petitioner's second ground of ineffective assistance of trial counsel alleges trial counsel was ineffective for failing to locate, interview and call witnesses at trial who could have testified Petitioner had consumed numerous alcoholic drinks on the day of the crime. *See* Habeas Pet. at 12.

Following the evidentiary hearing, the PCR court denied this claim finding Petitioner failed to establish trial counsel's failure to call a character witness and Petitioner's god-sister prejudiced Petitioner as required by *Strickland*. (ECF No. 10-11 at 9.) The Appellate Division affirmed the PCR court ruling, explaining the following:

> [Petitioner] testified that she asked [trial counsel] to interview Robin Bromley and Rotina Priester. [Petitioner] suggested Priester could have served as a character witness to counter what she perceived as her portrayal at trial as a "monster" and a "horrible person." In her affidavit, [Petitioner] claimed Bromley could have testified that she and [Petitioner] had been drinking that day and perhaps supported a defense of voluntary intoxication. On cross-examination, the State confronted [Petitioner] with Bromley's statement to police that [Petitioner] had told Bromley not to return to her house the night of the murder. [Trial counsel] had no specific recollection of defendant recommending that she interview these two potential witnesses.
>
> The PCR judge concluded that [Petitioner] had failed to establish any prejudice from trial counsel's failure to investigate or call either witness. The judge noted that counsel's general disinclination to call such witnesses was a reasonable strategic choice entitled to some deference, and doubted, in any event, that Bromley's testimony would have been helpful in light of her statement to the police, or that any favorable testimony from character witnesses would have influenced the outcome of [Petitioner's] case.
>
> "[W]hen a petitioner claims [her] trial attorney inadequately investigated [her] case, [she] must assert the facts that an investigation would have revealed, supported by affidavits or

certifications based upon the personal knowledge of the affiant or the person making the certification." *State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div.) (citing R. 1:6-6), certif. denied, 162 N.J. 199 (1999).

We are satisfied that defendant failed to provide any support for her claim of ineffective assistance here and we will not second-guess her counsel's strategic decision not to call witnesses who could have provided damaging testimony at trial.

*Freeman*, A-3386-14T2 at 17-18.

Under federal law, a failure to investigate potentially exculpatory evidence or witnesses may form the basis of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690-91; *see also Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016). To successfully establish this claim, a petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained ... and whether such information, assuming admissibility in court, would have produced a different result." *See Brown*, 2016 WL 1732377, at *5 (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted)). The petitioner must also still demonstrate he suffered prejudice. *See Strickland*, 466 U.S. at 690-91. But, where a petitioner merely speculates as to what a witness might have said if interviewed by counsel and does not present sworn testimony from that witness, a petitioner will not be able to establish the prejudice prong of *Strickland*. *See Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001) (citing *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989)).

Here, Petitioner makes only conclusory arguments potential witnesses Robin Bromley and Rotina Priester could have testified at trial to Petitioner's character and that Petitioner consumed numerous alcoholic drinks and was intoxicated the day of the crime. *See* Habeas Pet. at 12, 14. Petitioner has not provided any sworn testimony, affidavit, or certification from either witness. *See*

*id.* Petitioner's mere speculation regarding the potential witnesses' testimony is insufficient to establish prejudice. *See Duncan*, 256 F.3d at 201-02.

Additionally, when asked what trial counsel would do if she had been presented with a witness who would have testified Petitioner was honest and law abiding, trial counsel stated, "[h]onest and law abiding, I would [not] open the door [] in a million years." (ECF No. 10-9, N.T. 7/25/14 at 18:22-23.) Trial counsel was aware Petitioner had a prior conviction. (*Id.* at 18:24 to 19:1.) As noted by the Appellate Division, Bromley told police Petitioner had told Bromley not to return to Petitioner's house the night of the murder. (*Id.* at 62:10 to 63:16.) Petitioner has failed to show any decision by trial counsel not to call the alleged witnesses was not the result of reasoned professional judgment. *Strickland*, 466 U.S. at 690.

Petitioner has failed to show trial counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687. Petitioner has also failed to show any potential information from these witnesses would have produced a different result at Petitioner's trial. *See Brown*, 2016 WL 1732377, at *5. Petitioner cannot demonstrate the state court's adjudication was an unreasonable application of clearly established federal law. Thus, Petitioner's claim is denied.

### 3. Double Jeopardy

Petitioner next argues trial counsel failed to argue for dismissal of the indictment on double jeopardy grounds after Petitioner's first trial ended in a mistrial. Habeas Pet. at 14.

The Appellate Division summarized the facts from Petitioner's first trial that give rise to this claim as follows:

> Here, the mistrial was ordered after a detective, called by the State, testified on cross-examination that [Petitioner] had provided investigators with certain incriminating evidence against [Petitioner's co-defendant,] Turner. After confirming that investigators obtained a warrant for phone records for the phones of three individuals, the detective not only identified [Petitioner] as the

source of the information, but volunteered that one of the phone numbers she provided belonged to Turner:

> Q.      Who gave you these phone numbers to put in your affidavit to get the warrant?

> A.      We initially got those phone numbers from Karla Freeman at the police station.

> Q.      At the police department?

> A.      Yes.

> Q.      Karla Freeman gave all three phone numbers?

> A.      Yes. She obtained those -- she knew her cell phone number, she gave us her cell phone number. Then she retrieved the two numbers from her cell phone belonging to Maurice Turner and also the victim.

> . . . .

> She stated she had Maurice Turner's cell phone number, but she did not know it by heart. It was in her cell phone.

After hearing these responses, Turner's counsel moved for a mistrial pursuant to *United States v. Bruton*, 391 U.S. 123, 126, 88 S. Ct. 1620, 1622, 20 L. Ed. 2d 476, 479 (1968), on the ground that there was no way for him to cross-examine [Petitioner], the source of the information incriminating his client. The detective was then questioned out of the jury's presence and acknowledged he had never interviewed [Petitioner] himself and had no personal knowledge of the incriminating statement. [Petitioner's] counsel joined in the motion, and the trial judge granted a mistrial the following day[.]

*Freeman*, A-3386-14T2 at 12-14.

The Double Jeopardy Clause forbids "any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause "protects a criminal defendant from repeated prosecutions for the same offense." *Oregon v. Kennedy*, 456

U.S. 667, 671 (1982). "The Double Jeopardy Clause, however, does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Id.* at 672.

In *Kennedy*, the Oregon Court of Appeals found the Double Jeopardy Clause barred a retrial because the prosecutor's misconduct in asking an expert witness if the reason the witness had never done business with the defendant was "because he is a crook" amounted to "overreaching," even though the trial court had determined it was not the prosecutor's intention to cause a mistrial. *Kennedy*, 456 U.S. at 669. The Supreme Court held, where the defendant moves for a mistrial, the Double Jeopardy Clause bars retrial only where the prosecutor intended to provoke the defendant into seeking a mistrial:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause ... Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Kennedy*, 456 U.S. at 675-76.

The Supreme Court held in *Kennedy* where the Oregon courts found "the prosecutorial conduct culminating in the termination of the first trial ... was not so intended by the prosecutor, that [was] the end of the matter for purposes of the Double Jeopardy Clause[.]" *Id.* at 679.

The Appellate Division affirmed the PCR court's denial of this claim, reasoning:

> Whether a mistrial bars re-prosecution depends on the circumstances of each case. *Illinois v. Somerville*, 410 U.S. 458, 464, 93 S. Ct. 1066, 1070, 35 L. Ed. 2d 425, 431 (1973). Generally, subsequent retrial is constitutionally permissible so long as there was "sufficient legal reason and manifest necessity to terminate [the] trial," [*State v. Loyal*, 164 N.J. 418, 435 (2000),] or the defendant consents to the termination, *United States v. Dinitz*, 424 U.S. 600, 607, 611, 96 S.

> Ct. 1075, 1079-81, 47 L. Ed. 2d 267, 274, 276 (1976), and provided, in either case, that the mistrial was not brought about by "bad faith, inexcusable neglect or inadvertence[,] or oppressive conduct on the part of the State." [*State v. Farmer*, 48 N.J. 145, 174 (1996, cert. denied, 386 U.S. 991, 87 S. Ct. 1305, 18 L. Ed. 2d 335 (1967).] Statutory protection against double jeopardy echoes the constitutional standard in relevant respect. *See* N.J.S.A. 2C:1- 9(d) (delineating proper circumstances for termination, including where made with defendant's consent or "required by a sufficient legal reason and a manifest or absolute or overriding necessity").

*Freeman*, A-3386-14T2 at 12. The Appellate Division explained the testimony which led to the mistrial was elicited during cross-examination, the mistrial motion was made by Turner's counsel, and Petitioner's counsel subsequently joined in the motion. *Id.* at 14. The Appellate Division noted Petitioner did not allege "bad faith or oppressive conduct, but argue[d] that the State's 'inexcusable neglect' should have barred her retrial." *Id.* The Appellate Division denied this claim, ruling there was no inexcusable neglect, as the detective unexpectedly provided inadmissible testimony in response to a question from co-defendant Turner's counsel. *Id.* at 15. Thus, dismissal of the indictment on double jeopardy grounds was not required. *Id.*

The AEDPA requires this Court to presume the correctness of the Appellate Division's factual finding that there was no inexcusable neglect by the prosecutor; Petitioner has not rebutted this presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. at 240 (a district court must "presume the [state] court's factual findings to be sound unless [petitioner] rebuts the 'presumption of correctness by clear and convincing evidence.'"). Petitioner has not shown this finding was based on an unreasonable determination of the facts in light of the evidence presented and she is not entitled to habeas relief under 28 U.S.C. § 2254(d)(2).

Additionally, the testimony that led to the mistrial was elicited during cross-examination by co-defendant Turner's counsel. The prosecutor did nothing to provoke defense counsel into

requesting a mistrial. *Kennedy*, 456 U.S. at 675-76. The Appellate Division did not unreasonably apply *Kennedy* or other Supreme Court precedent when it held dismissal of the indictment was not required on double jeopardy grounds. *See* 28 U.S.C. § 2254(d)(1) and (d)(2); cf. *United States v. Williams*, 472 F.3d 81, 88 (3d Cir. 2007) ("Because the applicable standard for a double jeopardy bar as a result of prosecutorial misconduct requires a showing that the Government had in fact intended to goad the defendant into requesting a mistrial, and there was no such showing in this case, it was error to dismiss the indictment.") Trial counsel cannot be ineffective for declining to raise a meritless issue. *See Premo v. Moore*, 562 U.S. 115, 124 (2011). Petitioner is not entitled to habeas relief on this claim.

### 4. Right to Testify

Petitioner's final ineffective assistance of trial counsel claim alleges trail counsel "gave an ineffective presentation that deprived Petitioner of her right to testify at trial on her own behalf." Habeas. Pet. at 14.

This claim was addressed during the July 25, 2014 evidentiary hearing. (*See* generally ECF No. 10-9, N.T. 7/25/14.) At the hearing, defense counsel testified she did not have an independent recollection of advising Petitioner on her right to testify. However, it is defense counsel's practice to discuss the pros and cons of testifying with her clients. (*Id.* at 6:16 to 8:3.) Petitioner testified at the evidentiary hearing and stated she did not recall discussing her right to testify with defense counsel. (*Id.* at 49:22 to 50:4.) When asked if she wanted to testify, Petitioner said "I did but I didn't." (*Id.* at 50:8.) She explained she did not want to testify because there are things on the streets with snitching and Petitioner believed she would not be convicted of felony murder. (*Id.* at 50:10-15.) Petitioner testified she never told counsel she wanted to testify, and counsel never told Petitioner not to testify. (*Id.* at 50:16-23.)

Relevant to this issue, at trial, prior to summations, the trial judge advised Petitioner of her right to testify on her own behalf. (ECF No. 9-10, N.T. 11/1/06 at 68:8-20.) The trial court then gave Petitioner fifteen minutes with defense counsel to discuss Petitioner's right to testify. (*Id.* at 69:2-3.) Following the break, defense counsel informed the court counsel had spoken to Petitioner regarding her right to testify and Petitioner's position was she would not testify. (*Id.* at 74:6-8.) Petitioner confirmed she was choosing not to testify and told the court she had no further questions regarding her right to testify. (*Id.* at 74:11-17.)

The Appellate Division affirmed the PCR court's denial of this claim, finding:

> A criminal defendant possesses a fundamental right to testify on his or her own behalf at trial, a right which may be waived "only by [the defendant's own] 'intentional relinquishment or abandonment.'" *State v. Savage*, 120 N.J. 594, 628 (1990) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 (1938)). To inform the defendant's decision whether to testify, counsel has a duty to "advis[e him or her] of the benefits inherent in exercising that right and the consequences inherent in waiving it." *Id.* at 631. A failure in that regard may give rise to a claim for ineffective assistance. *Ibid.*
>
> The trial record demonstrates that [Petitioner] was apprised by the trial judge of her right to testify, stated that she had no questions about it, and was permitted fifteen minutes to discuss the matter with counsel prior to making a decision. At the conclusion of that discussion, counsel informed the court, and [Petitioner] confirmed, that she wished to remain silent.
>
> [Petitioner's] claims that she wanted to testify but declined because she was uninformed find no support in the record. Nor did [Petitioner's] testimony at the hearing, where she was, at best, ambivalent about her desire to testify, buttress her claim. The PCR judge's conclusion that counsel was not ineffective for failure to advise [Petitioner] finds ample support in the record.

*Freeman*, A-3386-14T2 at 20-21.

The Fifth Amendment guarantees "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This right also includes the absolute right

by a criminal defendant to testify on his own behalf if he chooses to do so. *See Rock v. Arkansas*, 483 U.S. 44, 51 (1987). The right to testify can be waived, but both the New Jersey Supreme Court and the Third Circuit have held that this waiver must be knowing and voluntary. *See United States v. Leggett*, 162 F.3d 237, 246 (3d Cir. 1998); *State v. Savage*, 577 A.2d 455, 573 (N.J. 1990). Consequently, both courts have held defense counsel has an obligation to inform and explain to a defendant his or her right to testify, and failure to do so constitutes ineffective assistance of counsel. *See Leggett*, 162 F.3d at 247; *Savage*, 577 A.2d at 473.

The record does not support Petitioner's assertion trial counsel deprived Petitioner of the right to testify on her own behalf. Specifically, trial counsel testified it is her practice to advise her client on the pros and cons of testifying at trial. (ECF No. 10-9, N.T. 7/25/14 at 6:16 to 8:3.) Petitioner testified part of her did not want to testify because she believed she would not be convicted and she was scared of snitching. (*Id.* at 50:10-15.) Petitioner also stated on the record at trial that she spoke with counsel regarding her right to testify and she did not want to testify. (ECF No. 9-10, N.T. 11/1/06 at 74:11-17.) Such "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73-75 (1977). Based on this record, the Court does not find counsel's representation "fell below an objective standard of reasonableness." *See Jacobs*, 395 F.3d at 102.

The state court's factual determination the record did not support Petitioner was not informed of her right to testify is entitled to considerable deference on habeas review. *See, e.g., Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 281 (3d Cir. 2016). The state court's decision was not based on factual determinations that were "objectively unreasonable in light of the evidence presented in the state-court proceedings." *See id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). The state court's finding the deficient-performance prong was not satisfied by

these facts was a reasonable application of *Strickland*. 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to habeas relief based on this claim.

### F. Ground Seven and Ground Eight: Prosecutorial Vindictiveness and Related Ineffective Assistance of Appellate Counsel

Petitioner's seventh ground alleges the prosecutor's refusal to offer a plea bargain to Petitioner prior to the first trial was retaliatory, punitive and deprived Petitioner of equal protection under the law. Habeas Pet. at 15. Petitioner states during a pretrial hearing, the prosecutor was overheard telling a detective "[i]f [defense counsel] was going to make it hard on [the prosecutor] then [the prosecutor] was going to make it hard on [Petitioner.]" *Id.* Petitioner notes she did not receive a plea offer until after her first trial ended in a mistrial. *Id.* The second portion of Petitioner's eighth ground submits appellate counsel on direct appeal was ineffective for not raising the claim the prosecutor should have been removed from the case. Habeas Pet. at 17.

Petitioner raised these issues on collateral appeal. (*See* ECF No. 10-15, at 38-46, 55-57.) Both the PCR court and the Appellate Division reviewed these claims and found appellate counsel on direct appeal was not ineffective, reasoning Petitioner failed to establish she was prejudiced by appellate counsel not raising this claim because there was no indication the appellate court would have granted relief on this ground. (*See* ECF No. 10-11 at 10; *see also Freeman*, A-3386-14T2 at 21-23.) The Appellate Division explained the situation that led to this claim as follows:

> After [Petitioner's] counsel had demanded outstanding discovery, the prosecutor told the detective, "if [Petitioner's counsel] was going to make it hard on [the prosecutor], then [the prosecutor was] going to make it hard on [Petitioner]."

> The prosecutor did not deny making the statement but explained:

> > Judge, I believe it was said with respect to [counsel], but it's -- the notion is that [counsel] has approached us for consideration on behalf of her client. And I just talked to the detective, and I said, if it's going to be

> hard for us, we're not going to have any consideration
> for her.
>
> Personally, Judge, I was talking to the lead detective,
> and I didn't know we were going to be subject to
> eavesdropping. If I caused [counsel] some concern,
> I'm sorry.

> [Petitioner's] counsel then moved to have the prosecutor removed
> from the case, arguing it was unacceptable for the prosecutor to
> penalize [Petitioner] for requesting discovery that should already
> have been provided. Counsel surmised that the prosecutor would also
> "penalize" [Petitioner] by not offering her "a lenient plea bargain."
> The prosecutor responded that he "had conversations with the family
> of the victim" and was "not inclined to give [Petitioner] a plea
> bargain." The judge denied [Petitioner's] motion and the matter was
> not raised on direct appeal.

*Freeman*, A-3386-14T2 at 22. The Appellate Division reviewed the PCR court ruling on this issue

and found:

> The judge concluded that [Petitioner] had not demonstrated any
> deficiency in appellate counsel's performance in not raising the issue.
> The judge doubted counsel would have been successful if the issue
> has been raised, particularly given the State's plea offer prior to the
> second trial, which cut defendant's exposure "in half." The judge
> found that [Petitioner] had not demonstrated prejudice, and had not
> shown that further litigation of the prosecutorial misconduct claim
> would have changed the outcome of her case.

> While we do not condone the prosecutor's comment, we agree with
> the PCR judge that [Petitioner] failed to demonstrate prejudice and
> was ultimately offered a favorable plea agreement which she
> rejected. The judge appropriately concluded that appellate counsel
> was not ineffective for failing to raise this claim of prosecutorial
> misconduct on appeal.

*Id.* at 23. Finding appellate counsel was not ineffective, the state court found the underlying claim

of prosecutorial retaliation lacked merit given the fact the State did offer Petitioner a plea offer

prior to her second trial. *Id.*

The Appellate Division's affirmance of the denial of PCR was neither contrary to, nor an unreasonable application of, clearly established federal law.

The Supreme Court has held "while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). The Supreme Court in *Bordernkircher v. Hayes* held to "punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." 434 U.S. 357, 363 (1978), quoted in *Goodwin*, 457 U.S. at 372, 102 S.Ct. at 2488. It is well-established "prosecutorial vindictiveness" may constitute a due process violation, because "for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.' " *Bordenkircher*, 434 U.S. at 363 (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 32–33 n.20 (1973)).

A defendant has the burden of proving a claim of prosecutorial vindictiveness. *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993.) "In general, there are two ways in which a defendant can prove a claim of vindictiveness. First, a defendant may use evidence of a prosecutor's retaliatory motive to prove actual vindictiveness. Second, in certain circumstances, a defendant may show facts sufficient to give rise to a presumption of vindictiveness." *Id.* (citing *Goodwin*, 457 U.S. at 374, 380 & n.12, 384) (internal citations omitted).

The Third Circuit Court of Appeals in *United States v. London* explained:

> Normally, however, a criminal defendant must offer proof of "actual vindictiveness" in order to assert a due process claim. *See United States v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992). Only in the rare circumstances where "a reasonable likelihood of vindictiveness exists" do we recognize a "presumption of vindictiveness," which allows a defendant to bring a constitutional claim without offering any concrete proof of improper governmental motive. *Id.*

41

> No such presumption applies in the context of plea bargaining. "[B]y tolerating and encouraging the negotiation of pleas," our system "has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right" to proceed to a jury trial. *Bordenkircher*, 434 U.S. at 364, 98 S.Ct. 663. In other words, "in the 'give-and-take' of plea bargaining, there is no ... element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Id.* at 363, 98 S.Ct. 663. Thus, absent proof of actual vindictiveness, no due process violation occurs when the prosecution does exactly what the Government supposedly attempted to do here: induce a guilty plea by threatening a greater penalty upon conviction after trial. *Id.*

747 F. App'x 80, 83-84 (3d Cir. 2018).

Trial counsel motioned to have the prosecutor removed from the case, alleging the prosecutor was not going to offer Petitioner a lenient plea bargain because trial counsel requested discovery. (ECF No. 8, N.T. 8/6/04 at 41:23 to 42:11.) The prosecutor responded to this allegation by explaining the prosecutor had spoken to the family of the victim and was not inclined to offer a plea to Petitioner and he had no vendetta against Petitioner, but was referring to trial counsel asking for consideration after alleging the prosecutor was covering things up. (*Id.* at 42:12 to 42:1.) The trial court denied the motion. (*Id.* at 43:2-3.) The Appellate Division noted the prosecutor did ultimately offer Petitioner a plea deal that would have cut Petitioner's exposure "in half" prior to her second trial. *Freeman*, A-3386-14T2 at 23. Considering the prosecutor's explanation that after conversation with the victim's family there was no plea offer, that the prosecutor was not referring to a vendetta against Petitioner, and the fact Petitioner was later offered a plea deal, Petitioner has failed to prove actual vindictiveness. The Appellate Division found Petitioner failed to show appellate counsel was ineffective for not raising the claim the prosecutor should have been removed from the case because it was unlikely the claim would have been successful. The Appellate Division found Petitioner did not prove further litigation of her claim would have

changed the outcome of Petitioner's case. Counsel cannot be ineffective for declining to raise a meritless issue. *See Premo*, 562 U.S. at 124. Petitioner has not shown adjudication of his ineffective assistance of counsel claim by the Appellate Division was contrary to, or involved an unreasonable application of, *Strickland* and its progeny. *See Id.* at 122 (citation omitted) (when the *Strickland* analysis is combined with 28 U.S.C. § 2254(d), federal habeas courts' analysis is "doubly" deferential to both the state court and the defense counsel). For these reasons, habeas relief is denied as to ground seven and the portion of ground eight discussed in this claim.

### G. Ground Eight: Ineffective Assistance of Appellate Counsel for Failing to Challenge the Jury Instruction

Petitioner's eighth ground alleges appellate counsel on direct appeal was ineffective for failing to argue the trial court erred in not instructing the jury on conspiracy. Habeas Pet. at 17.

Petitioner raised this claim on collateral appeal to the PCR court, who denied the claim as meritless. (ECF No. 10-11 at 10.) The PCR court found Petitioner was not entitled to a conspiracy charge because Petitioner was not charged with conspiracy. (*Id.*) The PCR court found appellate counsel was not ineffective for failing to raise a meritless argument that the court should have given an instruction on an uncharged offense. (*Id.*) Additionally, the PCR court found Petitioner failed to prove if the jury had received a conspiracy charge, the outcome of Petitioner's case would have been different, as required by *Strickland*. (*Id.*)

The Appellate Division affirmed the PCR court ruling and reasoned as follows:

> Even though [Petitioner] was never charged with conspiracy, defense counsel requested that the trial judge instruct the jury that [Petitioner] could not be convicted of felony murder if the jury found she was an accomplice to the robbery predicated on conspiracy alone. The judge declined to give the requested charge, but agreed to give an instruction based on the model charge for accomplice liability without reference to the word "conspiracy."

> During closing arguments, the prosecutor remarked:

> [Turner] said after he got the money, it would be half and half. He was going to take the money, he was going to share in the proceeds. That is a conspiracy; she is an accomplice. They're going to share in the loot they were going to get from William Goldware.

As a result of this comment, [Petitioner's] counsel renewed her request, but the court again denied the motion and gave the following instruction based on the model charge:

> A person is legally accountable for the conduct of another person, when she is an accomplice of such person in the commission of an offense.
>
> Thus, a person is an accomplice of another person in the commission of an offense, if[,] with the purpose of promoting or facilitating the commission of the offense, she aids, or agrees, or attempts to aid such person, such other person in planning or committing the crime.

[Petitioner] argued that this charge was misleading in light of the prosecutor's mention of "conspiracy," and could have influenced the jury to convict defendant of felony murder based on that inappropriate predicate offense.

. . .

[Petitioner] has not shown a likelihood that the jury was so confused that it convicted [Petitioner] of felony murder based on a predicate offense with which she was never charged due exclusively to a fleeting mention of conspiracy by the prosecutor. As [Petitioner's] challenge to the jury instruction lacked merit, it follows that appellate counsel could not have been ineffective for failing to raise it. [*See State v. Warlock*, 117 N.J. 596, 625 (1990)] ("The failure to raise unsuccessful legal arguments does not constitute ineffective assistance of counsel.").

*Freeman*, A-3386-14T2 at 24-25.

A defendant is as equally entitled to effective assistance of appellate counsel as he is to effective assistance of trial counsel. *Evitts v. Lucey*, 469 U.S. 387, 1055 S.Ct. 830, 83 L.Ed.2d 821 (1985). To prevail on a claim appellate counsel was ineffective, a defendant must establish two

elements: "counsel unreasonably failed to discover nonfrivolous issues," and the existence of "a reasonably probability that, but for his counsel's unreasonable failure ... he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756, 780 (2000).

Here, the state court found appellate counsel on direct appeal was not ineffective for failing to raise a meritless claim the trial court should have instructed the jury on a charge Petitioner was not charged with. The evidence against Petitioner was strong, including her admission she invited the victim to her home with the intention of robbing him with her co-defendant. Additionally, as noted by the state court, Petitioner was not charged with conspiracy. Thus, Petitioner has failed to show if appellate counsel had raised a claim on direct appeal that the trial court erred in not instructing on conspiracy, the result of her appeal would have been different.

As the record reveals, the state courts relied on the *Strickland* standard in evaluating Petitioner's ineffective counsel claim, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), the actions of the trial court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Petitioner's claim is denied.

**H.  Ground Nine: The Cumulative Error Denied Petitioner Due Process**

Petitioner's final ground for relief alleges the cumulative effect of the combined errors raised in the post-conviction relief rendered the trial unfair and violative of Petitioner's constitutional right to due process and a fair trial. Habeas Pet. at 18.

In order to constitute redressable "cumulative error," the deficiencies in a case must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hem v. Sullivan*, 601 F.3d 897, 917 (9th Cir. 2010) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotations and citations omitted).

As previously discussed, Petitioner's claims were extensively reviewed and rejected on the merits by the state courts, both on direct and collateral review, as discussed above, those decisions easily withstand review under AEDPA. Petitioner's claims recited above lack substantial merit. Petitioner has failed to show any of the above alleged errors cast doubt over the proofs of Petitioner's guilt which were presented at trial. Petitioner has failed to prove any prejudice from the alleged trial errors and there was significant evidence of Petitioner's guilt. Petitioner has not proven the alleged cumulative errors had a substantial and injurious effect or influence in determining the jury's verdict. *Fahy*, 516 F.3d at 205. Based on all of the forgoing, Petitioner's final ground is denied.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

For the reasons expressed above, Petitioner's claims are all without merit and jurists of reason would therefore not disagree with this Court's denial of Petitioner's habeas petition. Petitioner is therefore denied a certificate of appealability.

## V.   CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

**Date:**  October 7, 2021

> */s/Brian R. Martinotti*
> **HON. BRIAN R. MARTINOTTI**
> **UNITED STATES DISTRICT JUDGE**